seeks reversal. Contrary to the district courts, holding a reasonable jury could find Mayo Rochester was Appellant's employer. As this court is well aware, it reviews a grant of summary judgment de novo, reviewing the evidence in a light most favorable to Appellant, the non-moving party, and drawing all reasonable inferences in her favor. Now there's no dispute that Mayo Southeast was an employer of Appellant, but the district court was wrong in holding as a matter of law that Mayo Rochester was not also Appellant's employer for purposes of application of Minnesota's whistleblower statute. Now the Minnesota Supreme Court has described the existence of employer relationship as the ultimate fact issue. As the Minnesota Supreme Court has also stated, the five-factor test generally employed, which determines the legal relationship of the parties, is to be used as a guidepost. Can I ask a question? On the whistleblower count, which of those two entities did you sue? On that, it is Mayo Rochester. Just Mayo? Correct. And so what the Minnesota Supreme Court has said is, you look at the whole relationship, and it's not, we have these factors, these five agency factors, but they're just guideposts, that they're not, you have to look at them with respect to your specific facts. Now in determining whether there's an employer-employee relationship, the court looks to the nature of the relationship regardless of whether or not the party may be described in the document as an employer. So if you have a worker that is formally employed by one organization, but important aspects of the work are subject to control by another organization, and both organizations can be employers under Minnesota law. Now if you look at what the district court said, the district court agreed that Mayo Rochester furnished equipment and tools and controlled the Mayo Rochester hospital premises. The fact is, Mayo Rochester had the ability to discipline, to designate and formulate work rules and conditions, had the right to refuse to engage the worker and affect her compensation. Appellant had a clinical associate appointment which was ended solely by Mayo Rochester, and Appellant's questions about pay for her Rochester shifts and quality metrics specifically directed by Mayo Southeast to Mayo Rochester. So when one is talking about control, one looks at the overhaul relationship between the employee and the claimed employer, determine the nature and extent of the control reserved by the punitive employer. So while it's true, as this court has recognized, like any professional, a professional is given latitude as to the course of action for a particular patient, but the mere existence of that latitude is not dispositive of the right to control means and matter performance in determining whether the physician is an employee. So here we're talking about a doctor who was not simply granted access to hospital facilities to treat her own patients, but rather a doctor who was required to treat Mayo Rochester patients and much more. I think that the... She had a contract though with Southeast, right? Not Rochester. That's correct. And only Southeast had the right to terminate her employment, right? Well, no, because what Rochester could terminate her clinical appointment. So she was terminated for a clinical appointment by Mayo Rochester, but as to Mayo Southeast, that's true. Only Mayo Southeast could terminate her as to Mayo Southeast. Could Mayo Southeast terminate her as to both? In other words, if Mayo Southeast said, we don't want you anymore, does that automatically terminate the clinical appointment? I don't know because the way it is set up, the clinical appointment is with the relationship with Mayo Rochester. So my guess is, is if Mayo Southeast didn't want to go ahead with a clinical program anymore, yes, it could, but it looks to Mayo Rochester to make the person stay in that role. And that's exactly what happened here. I direct the court's attention to Mayo Rochester's March 29, 2016 annual review summary of appellant, and that's at A409 of the appendix. That document shows the control exercised by Mayo Rochester over appellant, which was beyond that of discharging professional responsibility to his patients, and shows there was an employment relationship. I think what's important to point out is that when an appellant is working with Mayo Rochester, it's not only as a clinical role, but it's also as a teaching role. And that's made clear in this review. So if you look at the looks at whether Mayo Rochester looks at appellant's performance metrics, it grades her efficiency in her patient care and the patient's length of stay. When it talks about medical knowledge, she was told she needed to be prepared to increase her involvement in lecturing. When you looked at practice-based learning and improvement in that category, the evaluation comments on appellant's teaching and the wonderful learning environment she creates. Appellant was not only seeing ER patients, but was being evaluated by Mayo Rochester as to her effectiveness as a Mayo Rochester faculty member, and that's also made clear in the document at confidential appendix 199. And then you look at the interpersonal and communication skills. That they address whether she's done national and regional lectures. She's told to launch or collaborate on research projects in 2016. And it was system-based practices. Here we're talking about money. Specifically, it identifies the coding of billing by Mayo Rochester and describes the need for revenue capture. So when you look at this as a whole, which the court must do, in a light most favorable to appellant, the trial court was wrong in declaring on summary judgment that there could be no whistleblower claim because Mayo Rochester was not an employer of appellant. Now the district court also denied appellant by maternity leave, the short-term disability pay she was entitled to for her 2016-2017 maternity leave, and short-term disability that she was entitled to for her 2015 miscarriage. I had a question. This is mostly for clarification. We looked at the record, and the short-term disability plan actually references ERISA. So I'm wondering why we have state law causes of action for breach of contract versus an ERISA claim here. That was never raised, and my understanding is that it's still with the disability would be a breach of contract claim. Okay. Turning to vacation, it's described in the appellant's contract as a benefit. Now the district court held as a matter of law that vacation does not mean paid vacation. But the evidence of record, viewed in a light most favorable to appellant, is appellant was specifically told she could take vacation for six weeks of her maternity leave, which must mean paid. Specifically, I referred to document 35 at A160, and this is from the Department of Emergency Medicine. In an email dated April 18, attaching the maternity leave policy, appellant was told that the FMLA policy for consultants is attached above. You are allowed 12 weeks off. The first six weeks you will get short-term disability. Then the next six weeks you can either use vacation PTO time or have off without pay. So based on what emergency medicine they're telling her, I mean she has vacation means paid and she was not paid. As to appellant's short-term disability pay for 2016-2017 maternity leave, Christopher Golden was designated as Mayo Southeast representative. He admitted that he had told appellant beginning in the third quarter of 2016 that her FTE would be .7143. And when Mayo moved to a salary structure, appellant was told in a document, and this is at appendix A365, that her bi-weekly pay was based on her specific FTE. He admitted that appellant's FTE affects the amount of STD required to be paid by Mayo. So in an FTE of .7143, appellant should have been paid that, but that's not what was paid her. Accordingly, the trial court again erred in its ruling that as a matter of law, the jury could not find a breach of contract obligation to pay appellant her actual FTE. The other arguments are briefed for this court, and I ask that this court reverse. Very well, thank you Ms. Hunt. Good morning, may it please the court, George Wood here on behalf of Mayo Clinic and Mayo Clinic's health system, Southeast. Obviously there are two entities involved here, and I'll refer to Mayo Clinic. I'll also refer to the Southeast entity as the Austin facility for your reference. The district court applied established law to the undisputed facts in this case and properly concluded that defendants were entitled to judgment as a matter of law on Dr. Plachek's claims. Those rulings should be affirmed because there's nothing in the undisputed record that would provide her with a right under her claims. With respect to Dr. Plachek's whistleblower claim, she challenges obviously the district court's decision that she wasn't employed. The district court properly applied the factors in Gilkey versus Roberts truck lines to conclude that Dr. Plachek was not an employee of Mayo Clinic. Of these factors, the district court felt that three of them were the most important. They were number one, control over her performance, number two, the motive paying her, and number three, the right to discharge her employment. Is it a problem though that you're alluding to this, so I'm just going to jump in. You've got three too. I know this isn't necessarily a counting exercise, but you have some factors leading the opposite way. Why not say there's a genuine issue of material fact and send it to a jury? Because Judge, if you look at the cases that we've cited, this is the one thing that Dr. Plachek ignores, and that is this court's decisions in Alexander, Glasslock, and Wojewski that basically say that these issues of providing, in fact, the type of equipment that's required these days, and I think it is actually in Glasslock where the court specifically says, listen, this is not the type of situation where a doctor walks around with a medical bag anymore. That's just not how we practice anymore. Because of that, we can't look at those factors as being important because ultimately, no doctor could practice if they had to bring everything with them. Hospitals are going to have that type of situation where they're going to be providing all of that equipment, they're going to be providing all of that stuff, and they bring these doctors in to give them what are called practice privileges. And if you look at those three cases, they specifically demonstrate that in this situation, that would be such that if you, in essence, held that a doctor who is provided with those types of benefits, i.e., the equipment that a hospital has and things like that, then in essence, every doctor that's employed by a practice group would also then have to be employed by the hospital, and that would be untenable. That's also not in keeping with what this court has said in Alexander, Klaslok, and Moyewski, because that's what Dr. Playcheck ignores in this case, is those rulings, and I think that they're very important here. Because the issue of control is of less importance under those circumstances, but in this situation, actually, the issue of control, as you pointed out, Judge Strauss, is found in her employment agreement. And in her employment agreement, very specifically, it says in section three, that she has to devote all of her professional time, attention, knowledge, and skills to the business and affairs of the employer. And the only employer that's identified in this case is the Austin facility. And they actually assign her to work 20% at Mayo Clinic. It says, physician will work on a full-time basis, 80% in Austin, and 20% at Rochester-St. Mary's, as determined by the employer. So they had control over what she does. Mayo Clinic did not have control over what she does. And in essence, section four of that agreement also says that Mayo Clinic supervises her. And if you look, for example, at the clinical appointment policy, which is at the appendix, page 189, first of all, the Austin facility had to approve Dr. Playcheck's time at Mayo Clinic, according to the Austin facility's site policy. That policy says that Dr. Playcheck's primary appointment, oversight, and accountability remain with the Austin facility. While Mayo Clinic could have reviewed her performance, it was required to report that information to the Austin facility as her supervisor, so that they would have that information. I think it's also important in this case that, at most under that policy, at most, she could be a .4 FTE at Mayo Clinic. In fact, she was a .2 FTE. She was a .8 or a .7, depending on whether she was full-time or part-time, at the Austin facility. And if you take that into account, you're basically saying, on the one hand, she's spending 20% of her time at Mayo Clinic. On the other hand, she's spending 80% of her time at the Austin facility, which has a specific written agreement with her that says it's her employer, and they're claiming that somehow Mayo Clinic is now going to be the employer as well. That's inconsistent with the cases that we've cited, but it's also inconsistent with her agreement. That agreement says that the Austin facility had control over where she worked. It didn't have to allow her to work at Mayo Clinic at all. It could have said no. It could have said, you're not going to be working there at all. Now, you asked a question, Judge Strauss, I think, about the issue of who had the right to terminate her. For example, if, in fact, she was terminated by the Austin facility, would she continue with Mayo Clinic? The answer to that question is no, she wouldn't. Because under the agreement, they have total control over where she works. And under the agreement, it says specifically that if she's let's look and see what happened when she lost her practice privileges at Mayo Clinic. She didn't stop working at the Austin facility. In fact, they offered her a 1.0 FTE again. They bumped her back up to where she was. She went back to where she was working. This is no different than, for example, an employer leasing out somebody to work at somebody's facility for a portion of their time and bringing them back. We do that all the time. We second our lawyers to clients. Are they the client's employees? No, they're our employees. They work for us. And that's exactly what happened in this situation. With respect to the other factors involved, it's clear that Dr. Plachek was paid by the Austin facility, not by Mayo Clinic. And her benefits were through the Austin facility. Now, Dr. Plachek tries to make a lot out of the fact that the Mayo Clinic reimbursed the for her services. But that argument actually only strengthens Mayo's position here because reimbursing another entity for the services of an employee of that entity doesn't show an employment relationship. It actually shows a leasing relationship. It would be no different than if I reimbursed someone to come in and have one of their employees come in and paint my house. It's the same situation. That shows an independent contractor relationship, not an employment relationship. Finally, the Austin facility, as I've mentioned, controlled termination of Dr. Plachek's employment. And in fact, as I've said, when her privileges were revoked at Mayo Clinic, she went back to the Austin facility and worked as full-time or as much as she wanted to from there until she left on her own. All of these factors demonstrate that Mayo Clinic was not her employer for purposes of the Minnesota Whistleblower Act. Now, with respect to the breach of contract claim, as counsel has indicated, there were three portions to this, an STD claim for 2015, an STD claim in 2016, and a vacation claim in 2016. The 2015 STD claim was found to be Now, Dr. Plachek doesn't argue here today that that was an improper analysis. She argues instead that she presented sufficient evidence of willfulness to apply a three-year limitations period, but that's not true. In order to prove willfulness, Dr. Plachek was required to prove that the Austin facility, quote, intentionally and deliberately, quote, close quote, failed to pay her disability benefits for 2015. So she has to prove intent and deliberateness under those circumstances. She can't do that here based on the facts. Dr. Plachek never even told the Austin facility about her need for benefits in 2015 until September of 2017. So in 2015, when she took time off, she never asked for the benefits. It wasn't until 2017, some two years later, that she asked for them. And what did Mayo Clinic do at that point in time? They investigated and they offered to pay her five days of benefits, which were two more than they thought they owed her, but she had asked for two additional days and they said, okay, we'll pay them for you. So under those circumstances, providing an employee with the exact number of days of short-term disability benefits that she asked for certainly can't be intentional or deliberate at any point. Now, there's an email that Dr. Plachek references where she says she asked for 12 days off. Beyond her own testimony of that, there is no evidence of that email. It wasn't discovered during discovery. And the fact that she says she asked for 12 days is actually inconsistent with the facts in this case, which are that in 2017, she asked for two days, not 12 additional days. There isn't any evidence of intent or deliberateness on the part of the Austin facility to deny benefits in 2015, so the three-year period of limitations can't apply. The two-year period does apply. The court properly ruled that that was the case and that ruling is not challenged here today. With respect to the 2016 short-term disability period, she challenges that based upon the idea that she wasn't properly paid because she claims she should have been paid based on what she thought was her actual FTE level. But that's a red herring in this case. First of all, Minnesota law is very clear. The payment of a benefit under Lee v. Fresenius is quote, wholly contractual. Dr. Plachek's contract says only that she'll be provided with the benefits consistent with the Austin facility's policies. And the Austin facility's short-term disability policy doesn't define the level of short-term disability benefits a physician is entitled to receive. It does not say that she's entitled to her actual FTE level. She admitted at her deposition that the short-term disability policy doesn't require her actual FTE level to be used, and that's at the confidential appendix, page 42. She also admitted that the Austin facility used its internal rules to calculate those benefits. So the fact of the matter is, there's no contract that she can point to that says, I'm required to be paid short-term disability benefits based on what I thought was an FTE. And as I've said, this FTE issue is a red herring. She's been raising it and it doesn't matter. Mayo Austin used that for purposes of calculating, okay, how much time is she going to spend on this shift, and how much time is she going to spend on that shift? But she got paid a salary. And that salary was broken down into a period of shifts. They did that so that they would know, okay, how many shifts do you have to work in a month, or in a week, or in a quarter? That was the only purpose behind it. The reason that the FTE level is a red herring is because there's nothing in the policy that would require Mayo to pay at any level. They could have paid her a base level per day. They could have said, you're going to get $200 per day in short-term disability benefits, and that's what they would have been able to do under the policy. They're not required to pay at any particular level. So the district court's ruling on that issue should be upheld. Finally, with respect to this paid vacation argument, again, there's nothing to support that in the record, and Judge Erickson properly dismissed that. The employment agreement provides only a right to, quote, vacation, close quote. It doesn't say, quote, paid vacation. And it's axiomatic that this court can't add words to an agreement to make that agreement say something different than it required to add the word paid to vacation. Now, I noticed that in the last argument, Judge Erickson was talking about definitions, and we provided you with several definitions of the word vacation. They do indicate it can be paid, but it's not required. The definition in Webster's vacation is a period spent away from home or business in travel or recreation. Oxford's American Dictionary says a time of rest and recreation away from one's work or school or a holiday. Now, vacation may be paid, but under those definitions, vacation is not required to be paid. And in this case, we need to use the normal, everyday definition of vacation here to interpret this contract, which is it means you get time off. You get to take the day off. It's no other type of situation like that. Now, she cites the several Austin facility policies that discuss the use of vacation, but those policies don't discuss whether she gets paid vacation. So the FMLA policy that Ms. Hunt cited to you says, yeah, you can use it if you have it, but if you don't have it, you can't use it. If you're not given it, you can't use it. So the distinction there is that those are not whether you have it or not. There's simply no contractual obligation here on the Austin facility's part to provide Dr. Playcheck with paid vacation. The district court properly ruled that there was no contractual obligation to pay Dr. Playcheck vacation independent of her annual salary as an exempt employee, and that ruling should be affirmed. Thank you. Thank you, Mr. Wood. Turning to the issue of employment. Under Minnesota law, when you have a leased employee, a leased employee, you have to pay a payment situation where you lease an employee to someone else. The Minnesota Supreme Court has held that both who it's been leased to as well as the one who's leasing it can be the employer for purposes of Minnesota law. I direct the court's attention to one of the cases is Alstead v. Brennan. This is by the Court of Appeals citing to the Minnesota Supreme Court, and it's at 645 Northwest 2nd 767. So when you're talking about a situation like this, you can definitely have two employers, and you have to separately look at each one to see if it meets the indicia of it being an employer-employee relationship. That is a question of fact. When you look at all of the facts, in a light most favorable to appellant, it meets the willful standard so that proceeding can go forward. I'd like to finally turn to the issue of the FTE. It's what Mayo's Southeast representative actually stated. He admitted, so he's presented as the one who knows how these policies work for Mayo. He admitted that he told appellant beginning in the third quarter of 2016 that her FTE would be .7143, and that's at A95 and 96 of the appendix. When appellant was told in a document that her biweekly pay was based on her specific FTE, and that's at A365 of the appendix. Now, Mayo's Southeast representative admitted that appellant's FTE affects the amount of her short-term disability required to be paid by Mayo, and that's at A96 of the appendix. So, if you take the proper FTE of .7143, she was not paid what she was required to be paid under Mayo's own policies of compensation. Now, the Minnesota An employer must honor what it has set out in its compensation policies. That case involved time off, and where he was not given his time off pay that he claimed he was entitled to. And there, the Minnesota Supreme Court said, you look at the policies, and they decided ultimately it was a question of fact. And what we have here in this case are questions of fact. None of this should have been decided by the district court as a matter of law dismissing the claims of appellant, and we're asking that this court applying the standard of review to Minnesota law, which applies to this case, that her case be reinstated. Thank you. Thank you, counsel. We appreciate your appearance and arguments today. Case is submitted, and we will decide it in due course.